## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | Case No.   10-10330 |
| Bayside Capital, LLC, d/b/a Bay View | § | |
| Capital LLC | § | |
| Debtor. | § | Chapter 11 |

**EMERGENCY MOTION OF DEBTOR FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL AND SETTING FURTHER AND FINAL HEARINGS ON <u>REQUEST FOR USE OF CASH COLLATERAL</u>**

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**A HEARING HAS BEEN REQUESTED FOR MAY 6, 2010, AT 9:00 A.M. IN CORPUS CHRISTI, TEXAS.**

**TO THE HONORABLE RICHARD S. SCHMIDT, UNITED STATES BANKRUPTCY JUDGE:**

NOW COMES the Debtor above as the Debtor-in-Possession in this Chapter 11 Proceedings, and files this Emergency Motion of Debtor for Interim Order Authorizing Use of Cash Collateral and Setting Further and Final Hearings on Request for Use of Cash Collateral, and in support thereof would show the Court the following:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this Motion is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEEDURAL BACKGROUND

2.      On May 3, 2010 (the "Petition Date") a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code was filed by the Debtor. No Trustee, examiner, or official committee of unsecured creditors have been appointed.

## BACKGROUND AND HISTORY OF THE DEBTOR

3.      Currently the Debtor operates several business enterprises on approximately 5.5 contiguous acres of real property and improvements located within the City of South Padre Island, consisting of Jim's Pier, Marina operations, Amberjack's Restaurant, Steamer's restaurant, and Fisherman's Wharf, along with Laguna Apartments and rental units at Fisherman's Wharf, and adjacent portions for public parking, all held to ultimately form the basis of the Debtor's core project called Laguna Galleria & Marina.  Currently operations of the various businesses are sufficient to continue operations without operating losses, including what is anticipated in bankruptcy related costs.

4.      Specifically, the Laguna Galleria & Marina is designed to ultimately create approximately 825,000 square feet of entertainment, retail, restaurant, hospitality, conference center and residential components, all combined into one urban development complex, to be completed in phases.  Architects have been engaged and the Town of South Padre City

Council supports the total project.  The Phases of Development are as follows:

> **a.**     **Phase I**.  Parking garage, Retail, SPI Visitors Center, Island Transportation Center.  This multi-use structure will be built on the Northwest corner of Amberjack Street and Padre Blvd.  Currently, the Debtor is proposing a six [6] story facility which will provide parking spaces needed by the Town of SPI and Laguna Galleria and Marina.

> In addition, this building will house prime-location retail and on the West end of the building, starting on the 3rd floor Debtor will build economical condos.  The condos are budgeted to be approximately 800 s.f. and sell for $125,000.  The Debtor is in the process of securing an agreement, in writing, with the Town that will commit the Town's financial participation in this project.

> **b.**     **Phase II**.  Boardwalk and Kiosk.   Phase II will be developed, in sub-phases, simultaneously starting at the North end of the property and moving South.  The plan is to locate the permanent launching slip at the end of Swordfish Street, along with the gas and diesel pumps.  Once this slip is located, Debtor will initiate the repair of the bulkhead and the construction of the Boardwalk.  The new marina, marina shops, and bar/restaurant to support Jim's Pier Marina will be the first new permanent building on the site.  It is the operating plan to continue to expand, over a phase-in period, the Boardwalk until the Debtor reaches the south end of the property.

> **c.**     **Phase III**.  Jims Pier Marina, Shops and Bar.  The permanent building housing the Marina Services, Shops, Food and Beverage will be located at the North end of the property and the permanent boat launching slip will be on Swordfish Street at the Bay.  This

location will be the main-docking area for large boats and the boat and fishing boat servicing and fueling operations.

   **d.**  **Phase IV**. Luxury Condominiums with 5-Star Amenities:

Once the Debtor has completed the Private Development District Master Plan, this fourth phase is a high-rise Luxury Condominium Tower, complete with a dedicated pool and 5-Star amenities, ranging from a World Class Spa, structured parking with dedicated elevators, to Valet and Food and Beverage Services. It is anticipated there will be approximately 75 condos.

   **e.**  **Phase V.** **4 Star Hotel, Conference Center and Retail** The final phase will be the 250 room, 4 Star Hotel, 40,000 sq ft conference center and 80,000 sq ft retail shopping complex.

   **f.**  **Phase VI**. Amberjacks Restaurant and Bar will be operated in its current location for the foreseeable future, estimated to be three [3] years. While the restaurant is leased to a third-party, it is an operating unit and a concept-prototype for other food and beverage service, which maybe be operated by parties associated with Bayside Capital, LLC. With Amberjacks showing a steady growth in sales and operating profit, it becomes a comparable enterprise to demonstrate to potential tenants the value of being in business on the Laguna Madre Bay.

## ORGANIZATIONAL STRUCTURE

   5.  The Debtor is an operating Arizona limited liability company, conducting business in the State of Texas under the authorized d/b/a "Bay View Capital, LLC" pursuant to the authority to operated granted by the Texas Secretary of State. The Debtor's business consists of

both development of the real estate Project described above, and the management and operations of related business enterprises including Jim's Pier and the Marina operations (including a full compliment of marina services, sale of fuel, ice, bait, tackle *etc.*) and the leasing of real property including Fisherman's Wharf, Steamer's Bar and Grill, Amberjack's Restaurant, and the Laguna Apartments.  The primary source of the income is reflected on the Budget attached hereto as Exhibit "A" and reflects not only a positive cash flow but an increase for the next 30 days of the cash accounts and accounts receivables.

<u>**THE POTENTIAL CASH COLLATERAL LENDERS**</u>

6.      The Debtor has two lenders that have been granted liens on potential cash collateral under the name Bayside Capital, LLC, as follow:

a.      First National Bank of Edinburg ("FNBE"):   The following is the description taken from the Secretary of State UCC Records reflecting the scope and extent of the Lien

> All of Debtor's interest in the following personal property and all proceeds of such property, including all inventory, furniture and equipment used in the business currently known as Amberjack's Restaurant located at 209 W. Amberjack, South Padre Island, Texas and all after-acquired collateral of the same classification.

The  UCC-1 filing is in the name of  Bayside Capital, LLC filed May 4, 2007 and applies to the operation of Amberjack's Restaurant.  Although the Debtor does own certain collateral described in this UCC-1, the cash is derived revenue from Amberjack's Restaurant is from rental income from the Debtor's real estate and not subject to a lien on "proceeds" as described in this UCC-1. In any event, operations for the next 30 days will increase the collateral base of cash as well as replace any of the personal property subject to this lien.

b.     BBVA Compass Bank ("BBVA"):  The following is the lien description taken from the filing at the Secretary of State UCC Records reflecting the scope and extent of the Lien:

4. This FINANCING STATEMENT covers the following collateral:
ALL INVENTORY; WHETHER ANY OF THE FOREGOING IS OWNED NOW OR ACQUIRED LATER; ALLACCESSIONS, ADDITIONS, REPLACEMENTS, AND SUBSTITUTIONS RELATING TO ANY OF THE FOREGOING; ALL RECORDS OF ANY KIND RELATING TO ANY OF THE FOREGOING; ALL PROCEEDSRELATING TO ANY OF THE FOREGOING (INCLUDING INSURANCE, GENERAL INTANGIBLES, ANDOTHER ACCOUNTS PROCEEDS); ALL EQUIPMENT; WHETHER ANY OF THE FOREGOING IS OWNED NOW OR ACQUIRED LATER; ALL ACCESSIONS, ADDITIONS, REPLACEMENTS, AND SUBSTITUTIONSRELATING TO ANY OF THE FOREGOING; ALL RECORDS OF ANY KIND RELATING TO ANY OF THE FOREGOING; ALL PROCEEDS RELATING TO ANY OF THE FOREGOING (INCLUDING INSURANCE,GENERAL INTANGIBLES, AND OTHER ACCOUNTS PROCEEDS).

The UCC-1 filing is in the name of Bayside Capital, LLC filed September 9, 2008.   Although the Debtor does have certain collateral described in this UCC-1, the proceeds of which are generated from operations (i.e., Jim's Pier, the Marina, *etc*.) the bulk of the cash income is derived from rental receipts not subject to a lien on "proceeds" and this lien may be inferior in priority to that of FNBE.

7.     In addition to the issue of the UCC-1 descriptions, it also appears that there may exist a competing claim to first access to the "cash collateral" (again, primarily arising from the operations of Jim's Pier and the marina operations) based on the filing dates and perfection of these liens.   The Debtor has not determined this issue and does not yet take a position about priority of these lien claims.  In any event, operations for the next 30 days will increase the collateral base of cash as well as replace any of the personal property subject to this lien.

8.     Finally, and in addition to the issue of competing claims arising from these two lenders, both UCC-1 statements do not reflect the name, registered at and mandated by the Secretary of State of Texas, under which the Debtor is authorized to transact business.   Both

UCC-1 filings are filed under a name not authorized to be used in the State of Texas.  The following is the record of the Secretary of State that indicates the "entity name [Bayside Capital, LLC] is not available in Texas.  Thus, the assumed name under which the Secretary of State that will allow the Debtor "to transact business" in the State of Texas is "*Bay View Capital, LLC*:"

| Form 304 |  | Filed in the Office of the |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $750 | **Application for Registration of a Foreign Limited Liability Company** | **Secretary of State<br>Filing #: 800785158 03/09/2007<br>Document #: 163095040002<br>Image Generated Electronically<br>for Web Filing** |

1. The entity is a foreign limited liability company. The name of the entity is :

**Bayside Capital, LLC**

2A. The name of the entity in its jurisdiction of formation does not contain the word "limited liability company" or "limited company"  (or an abbreviation thereof). The name of the entity with the word or abbreviation which it elects to add for use in Texas is:

2B. The entity name is not available in Texas. The assumed name under which the entity will qualify and transact business in Texas is:
**Bay View Capital, LLC**

There are no UCC-1 financing statements filed by either FNBE or by BBVA under the name Bay View Capital, LLC, and thus it is uncertain as to the validity or perfection of the liens reflected in the UCC-1 financing statements.  The Debtor has not determined this issue and does not yet take a position about the validity of the lien claims as to "cash collateral" or as to the other liens and mortgages held by FNBE or BBVA.   In any event, operations for the next 30 days will increase the collateral base of cash as well as replace any of the personal property subject to this lien.

### PROPOSED USE OF CASH DURING THE INTERIM PERIOD

9.      According to the 30-day Budget (attached hereto as Exhibit A), the Debtor expect to have cash needs of approximately $87,000.00 for operating and other business expenses during the 30-day period ending May 31, 2010, which they propose to pay using cash resources as of the Petition Date of less than $600.00 and anticipated cash generated from operations aggregating approximately $14,900.00.  Thus the Debtor expects a net positive increase in cash over the 30-day period of approximately $15,000.00.  It should be noted that mid-May of each year begins the summer season, and the *pro forma* budget, for example, indicates that net positive cash flow, assuming a beginning cash balance of $15,000.00 at the end of May, 2010, to be approximately $42,000.00 through June 31.

9.      The Debtor seek authority to use cash collateral in which FNBE/BBVA asserts an interest through June 8,2010, pursuant to the amounts set forth on the Budget.  The Debtor also requests the Court to schedule a further interim hearing on June 7, 2010, regarding the Debtor's continued use of cash collateral.   Within 15 days of this Motion, the Debtor will furnish FNBE and Compass Bank its 90 day budget.

10.      The Debtor requires the use of cash collateral to maintain ongoing operations. Debtor requests that they be allowed to use cash collateral in accordance with the Budget on terms and conditions approved by this Court after a hearing.

### THE DEBTOR SHOULD BE AUTHORIZED TO USE CASH COLLATERAL IN WHICH ITS SECURED CREDITOR ASSERTS AN INTEREST

11.      Section 363(c) of the Bankruptcy Code provides that a debtor may use cash collateral if all interested entities consent or the court, after notice and a hearing, authorizes such use.  11 U.S.C. § 363(c)(2).  Section 363(e) of the Bankruptcy Code requires that the use of cash

collateral be prohibited or conditioned as is necessary to provide *adequate protection* to persons that have an interest in cash collateral.  11 U.S.C. § 363(e) (emphasis added); *In re DeSardi,* 340 B.R. 790, 797-98 (Bankr. S.D. Tex. 2006) ("Adequate protection is . . . grounded in the belief that secured creditors should not be deprived of the benefit of their bargain.").  Read together, sections 363(c) and (e) of the Bankruptcy Code authorize a debtor to use the cash collateral of a secured creditor if a court determines that such creditor's collateral is adequately protected.  *See In re Certified Corp.*, 51 B.R. 768, 770 (Bankr. D. Haw. 1985) ("It is well established that a debtor is entitled to use cash collateral upon proof of adequate protection.").

12.     Although the term "adequate protection" is not precisely defined in the Bankruptcy Code, Section 361 sets forth three non-exclusive examples of what may constitute adequate protection: (1) periodic cash payments equivalent to decrease in value; (2) an additional or replacement lien on other property; or (3) other relief that provides the indubitable equivalent of an entity's interest in the property.  *In re Timbers of Inwood Forest Associates, Ltd.*, 793 F.2d 1380, 1388 (5th Cir. 1986), *aff'd*, 484 U.S. 365 (1988); *In re Curtis*, 9 B.R. 110, 111-12 (Bankr. E.D. Pa. 1981).  "[T]he debtor-in-possession has the burden of proof on the issue of adequate protection."  *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 406 (Bankr. N.D. Tex. 2003).

13.     Here, the Debtor seeks an order of this Court authorizing it to use cash collateral in which FNBE/BBVA asserts an interest (the "Cash Collateral") pursuant to Section 363 of the Bankruptcy Code, in order to pay ordinary expenses relating to ongoing operations of the Debtor's business.  As discussed below, FNBE/BBVA's interest in Cash Collateral is adequately protected by FNBE/BBVA's replacement lien (in post-petition collateral of the same type as

their existing security interest) and the equity cushion created through the Debtor's operations (as reflected in Exhibit "A" attached hereto).

### Adequate Protection Offered Lender

14.     **Equity Cushion**.  The existence of an "equity cushion" or a "value cushion"—the value of the collateral in excess of the amount of the secured claim at issue—"is the classic form of protection for a secured debt," and it is well settled that "the existence of an equity cushion, standing alone, can provide adequate protection."  *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 (9th Cir. 1984).  *Accord, Travelers Ins. Co. v. Plaza Family P'ship (In re Plaza Family P'ship)*, 95 B.R. 166 (E.D. Cal. 1989).

15.     FNBE/BBVA's equity cushion in "cash collateral" will actually increase during this period of operations so long as the Debtor's business remains operational. Thus, such equity cushion alone adequately protects FNBE/BBVA's interest in Cash Collateral.

16.     **Replacement Lien**.  The Bankruptcy Code expressly provides that granting a replacement lien is a recognized method of providing adequate protection.   Section 361(2) provides, in relevant part, that "such adequate protection may be provided by . . . providing to such entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of such entity's interest in such property . . . ."  11 U.S.C. §361(2).  Courts have likewise determined that such a replacement lien constitutes adequate protection.  *See*, *e.g.*, *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 n.4 (10th Cir. 1987); *In re Dixie-Shamrock Oil & Gas, Inc.*, 39 B.R. 115, 118 (Bankr. M.D. Tenn. 1984).

17.     The Debtor proposes to grant a replacement lien for the benefit of FNBE/BBVA in collateral acquired post-petition of the same type as FNBE/BBVA's collateral under their

existing loan documents (the "Replacement Lien").  This Replacement Lien, by itself, constitutes adequate protection of FNBE/BBVA's interest in Cash Collateral.  *Cf.* Bankruptcy Code Section 552 (11 U.S.C. 522) (providing that a creditor's security interest does not extend to post-petition property if the court so orders "based on the equities of the case.")  The combination of their Replacement Lien and equity cushion provides more than adequate protection of FNBE/BBVA's interest in Cash Collateral.

18.     The Debtor proposes that the amount secured by the Replacement Lien will be equal to any diminution of FNBE/BBVA's Cash Collateral interest existing as of the Petition Date due to the Debtor's actual use thereof.  *See In re Cafeteria Operators, L.P.*, 299 B.R. at 410 (granting as adequate protection replacement liens encumbering increasing amounts of debtor's post-petition assets commensurate with decreasing levels of inventory/collateral "as [is] needed to restore and maintain the [creditors'] secured position in inventory as of the Petition Date.").  The Replacement Liens will have the same validity and priority as FNBE/BBVA's collateral interests pursuant to the existing loan documents.

19.     **Continued Operations**.  In addition to the foregoing, FNBE/BBVA's interest in Cash Collateral is further protected because the Debtor will use the Cash Collateral to pay for the ordinary and necessary expenses of maintaining and operating their business (as detailed in the Budget), thereby preserving the value of FNBE/BBVA's collateral.  Such expenditures are expected to result in the preservation of the value of the Debtor's operations and a continued stream of cash receipts from operations, thus providing adequate protection to FNBE/BBVA.  *See In re McCombs Properties VI, Ltd.,* 88 B.R**.** 261, 267 (Bankr. C.D. Cal. 1988) (finding that by committing cash collateral to pay operating expenses and to improve and maintain the

property, the debtor has substantially eliminated the risk of diminution of the secured creditor's interest in the cash collateral).

21.     Based on the foregoing, FNBE/BBVA's Cash Collateral interests will be adequately protected by the Debtor's proposed use of Cash Collateral and the granting of the replacement liens to the extent of the enforceability and validity, and value of all pre-petition liens.  Accordingly, the Debtor submits that this Court should grant the Motion.

### Request For Immediate Interim Relief

22.     Bankruptcy Rule 4001(b) permits a court to approve the use of Cash Collateral during the 15-day period following the filing of a motion "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bank. P. 4001(b)(2).  Here, the Debtor requires immediate access to Cash Collateral for the payment of necessary operating expenses.  If such interim relief is not obtained, the Debtor submits that their efforts to administer their estates for the benefit of all creditors and parties in interest will be immediately and irreparably jeopardized.  Accordingly, the Debtor requests that, pending a final hearing on the Debtor's Motion to Use Cash Collateral, the Court authorizes the Debtor to immediately use the Cash Collateral pursuant to the Budget.

### CONCLUSION

23.     For the reasons set forth above, the Debtor respectfully requests that the Court: (a) enter an interim order authorizing the Debtor to use FNBE/BBVA's Cash Collateral through **June 7, 2010** in accordance with the Budget; (b) schedule a further interim hearing on **June 7, 2010**, regarding the Debtor's continued use of the Cash Collateral during the Interim Period prior

to a final hearing regarding the Debtor's ongoing use of Cash Collateral; and (c) schedule a final

hearing regarding the Debtor's ongoing use of Cash Collateral.

Dated:  May 4, 2010.

Respectfully submitted,

**JORDAN, HYDEN, WOMBLE, CULBRETH &
HOLZER, P.C.**


*/s/ Shelby A. Jordan*

Shelby A. Jordan (Texas Bar No. 11016700)
Nathaniel Peter Holzer (Texas Bar No. 00793971)
Harlin C. Womble (Texas Bar No. 21880300)

500 North Shoreline Boulevard, Suite 900
Corpus Christi, Texas 78401
Telephone:  361.884.5678

Facsimile:  361.888.5555
**PROPOSED ATTORNEYS FOR Bayside
Capital, LLC, d/b/a Bay View Capital LLC**


<u>**CERTIFICATE OF SERVICE**</u>

*See*, the Master Certificate Of Service Of First Day Motions, proposed Orders, Voluntary
Petition, And List Of 20 Largest Unsecured Creditors filed in connection with all first day filings
reflecting service on May 4, 2010.